*196 Chief Justice Roberts
delivered the opinion of the
Court.
The plaintiff in this case is a small utility district raising a big question — the constitutionality of §5 of the Voting Rights Act. The district has an elected board, and is required by §5 to seek preclearance from federal authorities in Washington, D. C., before it can change anything about those elections. This is required even though there has never been any evidence of racial discrimination in voting in the district.
*197 The district filed suit seeking relief from these preclearance obligations under the “bailout” provision of the Voting Rights Act. That provision allows the release of a “political subdivision” from the preclearance requirements if certain rigorous conditions are met. The court below denied relief, concluding that bailout was unavailable to a political subdivision like the utility district that did not register its own voters. The district appealed, arguing that the Act imposes no such limitation on bailout, and that if it does, the preclearance requirements are unconstitutional.
That constitutional question has attracted ardent briefs from dozens of interested parties, but the importance of the question does not justify our rushing to decide it. Quite the contrary: Our usual practice is to avoid the unnecessary resolution of constitutional questions. We agree that the district is eligible under the Act to seek bailout. We therefore reverse, and do not reach the constitutionality of § 5.
I
A
The Fifteenth Amendment promises that the “right of citizens of the United States to vote shall not be denied or abridged ... on account of race, color, or previous condition of servitude.” U. S. Const., Arndt. 15, § 1. In addition to that self-executing right, the Amendment also gives Congress the “power to enforce this article by appropriate legislation.” §2. The first century of congressional enforcement of the Amendment, however, can only be regarded as a failure. Early enforcement Acts were inconsistently applied and repealed with the rise of Jim Crow. South Carolina v. Katzenbach, 383 U. S. 301, 310 (1966); A. Keyssar, The Right to Vote 105-111 (2000). Another series of enforcement statutes in the 1950’s and 1960’s depended on individual lawsuits filed by the Department of Justice. But litigation is slow and expensive, and the States were creative in “contriving new rules” to continue violating the Fifteenth Amendment *198 “in the face of adverse federal court decrees.” Katzenbach, supra, at 335; Riley v. Kennedy, 553 U. S. 406, 411 (2008).
Congress responded with the Voting Rights Act. Section 2 of the Act operates nationwide; as it exists today, that provision forbids any “standard, practice, or procedure” that “results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 42 U. S. C. § 1973(a). Section 2 is not at issue in this case.
The remainder of the Act constitutes a “scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant.” Katzenbach, supra, at 315. Rather than continuing to depend on case-by-case litigation, the Act directly pre-empted the most powerful tools of black disenfranchisement in the covered areas. All literacy tests and similar voting qualifications were abolished by §4 of the Act. Voting Rights Act of 1965, §§4(a)-(d), 79 Stat. 438-439. Although such tests may have been facially neutral, they were easily manipulated to keep blacks from voting. The Act also empowered federal examiners to override state determinations about who was eligible to vote. §§ 6, 7, 9, 13, id., at 439-442, 444-445.
These two remedies were bolstered by §5, which suspended all changes in state election procedure until they were submitted to and approved by a three-judge Federal District Court in Washington, D. C., or the Attorney General. Id., at 439, codified as amended at 42 U. S. C. § 1973c(a). Such preclearance is granted only if the change neither “has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.” Ibid. We have interpreted the requirements of § 5 to apply not only to the ballot-access rights guaranteed by § 4, but to drawing district lines as well. Allen v. State Bd. of Elections, 393 U. S. 544, 564-565 (1969).
To confine these remedies to areas of flagrant disenfranchisement, the Act applied them only to States that had used a forbidden test or device in November 1964, and had less *199 than 50% voter registration or turnout in the 1964 Presidential election. § 4(b), 79 Stat. 438. Congress recognized that the coverage formula it had adopted “might bring Within its sweep governmental units not guilty of any unlawful discriminatory voting practices.” Briscoe v. Bell, 432 U. S. 404, 411 (1977). It therefore “afforded such jurisdictions immediately available protection in the form of . . . [a] ‘bailout’ suit.” Ibid.
To bail out under the current provision, a jurisdiction must seek a declaratory judgment from a three-judge District Court in Washington, D. C. 42 U. S. C. §§ 1973b(a)(l), 1973c(a). It must show that for the previous 10 years it has not used any forbidden voting test, has not been subject to any valid objection under § 5, and has not been found liable for other voting rights violations; it must also show that it has “engaged in constructive efforts to eliminate intimidation and harassment” of voters, and similar measures. §§ 1973b(a)(l)(A)-(F). The Attorney General can consent to entry of judgment in favor of bailout if the evidence warrants it, though other interested parties are allowed to intervene in the declaratory judgment action. § 1973b(a)(9). There are other restrictions: To bail out, a covered jurisdiction must show that every jurisdiction in its territory has complied with all of these requirements. § 1973b(a)(3). The District Court also retains continuing jurisdiction over a successful bailout suit for 10 years, and may reinstate coverage if any violation is found. § 1973b(a)(5).
As enacted, §§4 and 5 of the Voting Rights Act were temporary provisions. They were expected to be in effect for only five years. § 4(a), 79 Stat. 438. We upheld the temporary Voting Rights Act of 1965 as an appropriate exercise of congressional power in Katzenbach, explaining that “[t]he constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects.” 383 U. S., at 308. We concluded that the problems Congress faced when it passed the Act were so dire *200 that “exceptional conditions [could] justify legislative measures not otherwise appropriate.” Id., at 334-335 (citing Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398 (1934), and Wilson v. New, 243 U. S. 332 (1917)).
Congress reauthorized the Act in 1970 (for 5 years), 1975 (for 7 years), and 1982 (for 25 years). The coverage formula remained the same, based on the use of voting-eligibility tests and the rate of registration and turnout among all voters, but the pertinent dates for assessing these criteria moved from 1964 to include 1968 and eventually 1972. 42 U. S. C. § 1973b(b). We upheld each of these reauthorizations against constitutional challenges, finding that circumstances continued to justify the provisions. Georgia v. United States, 411 U. S. 526 (1973); City of Rome v. United States, 446 U. S. 156 (1980); Lopez v. Monterey County, 525 U. S. 266 (1999). Most recently, in 2006, Congress extended §5 for yet another 25 years. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, 120 Stat. 577. The 2006 Act retained 1972 as the last baseline year for triggering coverage under §5. It is that latest extension that is now before us.
B
Northwest Austin Municipal Utility District Number One was created in 1987 to deliver city services to residents of a portion of Travis County, Texas. It is governed by a board of five members, elected to staggered terms of four years. The district does not register voters but is responsible for its own elections; for administrative reasons, those elections are run by Travis County. Because the district is located in Texas, it is subject to the obligations of § 5, although there is no evidence that it has ever discriminated on the basis of race.
The district filed suit in the District Court for the District of Columbia, seeking relief under the statute’s bailout provisions and arguing in the alternative that, if interpreted to *201 render the district ineligible for bailout, § 5 was unconstitutional. The three-judge District Court rejected both claims. Under the statute, only a “State or political subdivision” is permitted to seek bailout, 42 U. S. C. § 1973b(a)(l)(A), and the court concluded that the district was not a political subdivision because that term includes only “counties, parishes, and voter-registering subunits,” Northwest Austin Municipal Util. Dist. No. One v. Mukasey, 573 F. Supp. 2d 221, 232 (2008). Turning to the district’s constitutional challenge, the court concluded that the 25-year extension of §5 was constitutional both because “Congress . . . rationally concluded that extending [§] 5 was necessary to protect minorities from continued racial discrimination in voting” and because “the 2006 Amendment qualifies as a congruent and proportional response to the continuing problem of racial discrimination in voting.” Id., at 283. We noted probable jurisdiction, 555 U. S. 1091 (2009), and now reverse.
II
The historic accomplishments of the Voting Rights Act are undeniable. When it was first passed, unconstitutional discrimination was rampant, and the “registration of voting-age whites ran roughly 50 percentage points or more ahead” of black registration in many covered States. Katzenbach, supra, at 313; H. R. Rep. No. 109-478, p. 12 (2006). Today, the registration gap between white and black voters is in single digits in the covered States; in some of those States, blacks now register and vote at higher rates than whites. Id., at 12-13. Similar dramatic improvements have occurred for other racial minorities. Id., at 18-20. “[M]any of the first generation barriers to minority voter registration and voter turnout that were in place prior to the [Voting Rights Act] have been eliminated.” Id., at 12; Bartlett v. Strickland, 556 U. S. 1, 10 (2009) (plurality opinion) (“Passage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities *202 who seek to exercise one of the most fundamental rights of our citizens: the right to vote”).
At the same time, § 5, “which authorizes federal intrusion into sensitive areas of state and local policymaking, imposes substantial ‘federalism costs.’” Lopez, supra, at 282 (quoting Miller v. Johnson, 515 U. S. 900, 926 (1995)). These federalism costs have caused Members of this Court to express serious misgivings about the constitutionality of § 5. Katzenbach, 383 U. S., at 358-362 (Black, J., concurring and dissenting); Allen, 393 U. S., at 586, n. 4 (Harlan, J., concurring in part and dissenting in part); Georgia, supra, at 545 (Powell, J., dissenting); City of Rome, 446 U. S., at 209-221 (Rehnquist, J., dissenting); id., at 200-206 (Powell, J., dissenting); Lopez, 525 U. S., at 293-298 (Thomas, J., dissenting); id., at 288 (Kennedy, J., concurring in judgment).
Section 5 goes beyond the prohibition of the Fifteenth Amendment by suspending all changes to state election law — however innocuous — until they have been precleared by federal authorities in Washington, D. C. The preclearance requirement applies broadly, NAACP v. Hampton County Election Comm’n, 470 U. S. 166, 175-176 (1985), and in particular to every political subdivision in a covered State, no matter how small, United States v. Sheffield Bd. of Comm’rs, 435 U. S. 110, 117-118 (1978).
Some of the conditions that we relied upon in upholding this statutory scheme in Katzenbach and City of Rome have unquestionably improved. Things have changed in the South. Voter turnout and registration rates now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels. See generally H. R. Rep. No. 109-478, at 12-18.
These improvements are no doubt due in significant part to the Voting Rights Act itself, and stand as a monument to its success. Past success alone, however, is not adequate justification to retain the preclearance requirements. See *203 Issacharoff, Is Section 5 of the Voting Rights Act a Victim of Its Own Success? 104 Colum. L. Rev. 1710 (2004). It may be that these improvements are insufficient and that conditions continue to warrant preclearance under the Act. But the Act imposes current burdens and must be justified by current needs.
The Act also differentiates between the States, despite our historic tradition that all the States enjoy “equal sovereignty.” United States v. Louisiana, 368 U. S. 1, 16 (1960) (citing Lessee of Pollard v. Hagan, 3 How. 212, 223 (1845)); see also Texas v. White, 7 Wall. 700, 725-726 (1869). Distinctions can be justified in some cases. “The doctrine of the equality of States ... does not bar ... remedies for local evils which have subsequently appeared.” Katzenbach, supra, at 328-329 (emphasis added). But a departure from the fundamental principle of equal sovereignty requires a showing that a statute’s disparate geographic coverage is sufficiently related to the problem that it targets.
These federalism concerns are underscored by the argument that the preclearance requirements in one State would be unconstitutional in another. See Georgia v. Ashcroft, 539 U. S. 461, 491-492 (2003) (Kennedy, J., concurring) (“Race cannot be the predominant factor in redistricting under our decision in Miller v. Johnson, 515 U. S. 900 (1995). Yet considerations of race that would doom a redistricting plan under the Fourteenth Amendment or §2 seem to be what save it under §5”). Additional constitutional concerns are raised in saying that this tension between §§2 and 5 must persist in covered jurisdictions and not elsewhere.
The evil that §5 is meant to address may no longer be concentrated in the jurisdictions singled out for preclearance. The statute’s coverage formula is based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions. For example, the racial gap in voter registration and turnout is lower in the States originally covered by § 5 than it is nation *204 wide. E. Blum & L. Campbell, Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act 3-6 (Am. Enterprise Inst. 2006). Congress heard warnings from supporters of extending § 5 that the evidence in the record did not address “systematic differences between the covered and the non-covered areas of the United States [,] . . . and, in fact, the evidence that is in the record suggests that there is more similarity than difference.” The Continuing Need for Section 5 Pre-Clearance: Hearing before the Senate Committee on the Judiciary, 109th Cong., 2d Sess., 10 (2006) (statement of Richard H. Pildes); see also Persily, The Promise and Pitfalls of the New Voting Rights Act, 117 Yale L. J. 174, 208 (2007) (“The most one can say in defense of the [coverage] formula is that it is the best of the politically feasible alternatives or that changing the formula would . . . disrupt settled expectations”).
The parties do not agree on the standard to apply in deciding whether, in light of the foregoing, concerns, Congress exceeded its Fifteenth Amendment enforcement power in extending the preclearance requirements. The district argues that “ ‘[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end,’” Brief for Appellant 31 (quoting City of Boerne v. Flores, 521 U. S. 507, 520 (1997)); the Federal Government asserts that it is enough that the legislation be a “‘rational means to effectuate the constitutional prohibition,’” Brief for Federal Appellee 6 (quoting Katzenbach, supra, at 324). That question has been extensively briefed in this case, but we need not resolve it. The Act’s preclearance requirements and its coverage formula raise serious constitutional questions under either test.
In assessing those questions, we are keenly mindful of our institutional role. We fully appreciate that judging the constitutionality of an Act of Congress is “the gravest and most delicate duty that this Court is called on to perform.” Blod *205 gett v. Holden, 275 U. S. 142, 147-148 (1927) (Holmes, J., concurring). “The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States.” Rostker v. Goldberg, 453 U. S. 57, 64 (1981). The Fifteenth Amendment empowers “Congress,” not the Court, to determine in the first instance what legislation is needed to enforce it. Congress amassed a sizable record in support of its decision to extend the preclearance requirements, a record the District Court determined “document[ed] contemporary racial discrimination in covered states.” 573 F. Supp. 2d, at 265. The District Court also found that the record “demonstrat[ed] that section 5 prevents discriminatory voting changes” by “quietly but effectively deterring discriminatory changes.” Id., at 264.
We will not shrink from our duty “as the bulwar[k] of a limited constitution against legislative encroachments,” The Federalist No. 78, p. 526 (J. Cooke ed. 1961) (A. Hamilton), but “[i]t is a well-established principle governing the prudent exercise of this Court’s jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case,” Escambia County v. McMillan, 466 U. S. 48, 51 (1984) (per curiam). Here, the district also raises a statutory claim that it is eligible to bail out under §§4 and 5.
Justice Thomas argues that the principle of constitutional avoidance has no pertinence here. He contends that even if we resolve the district’s statutory argument in its favor, we would still have to reach the constitutional question, because the district’s statutory argument would not afford it all the relief it seeks. Post, at 212-214 (opinion concurring in judgment in part and dissenting in part).
We disagree. The district expressly describes its constitutional challenge to §5 as being “in the alternative” to its statutory argument. See Brief for Appellant 64 (“[T]he Court should reverse the judgment of the district court and *206 render judgment that the district is entitled to use the bailout procedure or, in the alternative, that § 5 cannot be constitutionally applied to the district”). The district’s counsel confirmed this at oral argument. See Tr. of Oral Arg. 14 (“[Question:] [D]o you acknowledge that if we find in your favor on the bailout point we need not reach the constitutional point? [Answer:] I do acknowledge that”). We therefore turn to the district’s statutory argument.
Ill
Section 4(b) of the Voting Rights Act authorizes a bailout suit by a “State or political subdivision.” 42 U. S. C. § 1973b(a)(l)(A). There is no dispute that the district is a political subdivision of the State of Texas in the ordinary sense of the term. See, e. g., Black’s Law Dictionary 1197 (8th ed. 2004) (“A division of a state that exists primarily to discharge some function of local government”). The district was created under Texas law with “powers of government” relating to local utilities and natural resources. Tex. Const., Art. XVI, § 59(b); Tex. Water Code Ann. § 54.011 (West 2002); see also Bennett v. Brown Cty. Water Improvement Dist. No. 1, 272 S. W. 2d 498, 500 (Tex. 1954) (“[W]ater improvement district[s]... are held to be political subdivisions of the State” (internal quotation marks omitted)).
The Act, however, also provides a narrower statutory definition in § 14(c)(2): “ ‘[PJolitical subdivision’ shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.” 42 U. S. C. § 1973l(c)(2). The District Court concluded that this definition applied to the bailout provision in §4(a), and that the district did not qualify, since it is not a county or parish and does not conduct its own voter registration.
“Statutory definitions control the meaning of statutory words, of course, in the usual case. But this is an unusual *207 ease.” Lawson v. Suwannee Fruit & S. S. Co., 336 U. S. 198, 201 (1949); see also Farmers Reservoir & Irrigation Co. v. McComb, 337 U. S. 755, 764 (1949); Philko Aviation, Inc. v. Shacket, 462 U. S. 406, 412 (1983). Were the scope of § 4(a) considered in isolation from the rest of the statute and our prior cases, the District Court’s approach might well be correct. But here specific precedent, the structure of the Voting Rights Act, and underlying constitutional concerns compel a broader reading of the bailout provision.
Importantly, we do not write on a blank slate. Our decisions have already established that the statutory definition in § 14(c)(2) does not apply to every use of the term “political subdivision” in the Act. We have, for example, concluded that the definition does not apply to the preclearance obligation of § 5. According to its text, § 5 applies only “[whenever a [covered] State or political subdivision” enacts or administers a new voting practice. Yet in Sheffield Bd. of Comm’rs, 435 U. S. 110, we rejected the argument by an Alabama city that it was neither a State nor a political subdivision as defined in the Act, and therefore did not need to seek preclearance of a voting change. The dissent agreed with the city, pointing out that the city did not meet the statutory definition of “political subdivision” and therefore could not be covered. Id., at 141-144 (opinion of Stevens, J.). The majority, however, relying on the purpose and structure of the Act, concluded that the “definition was intended to operate only for purposes of determining which political units in nondesignated States may be separately designated for coverage under §4(b).” Id., at 128-129; see also id., at 130, n. 18 (“Congress’ exclusive objective in § 14(c)(2) was to limit the jurisdictions which may be separately designated for coverage under §4(b)”).
We reaffirmed this restricted scope of the statutory definition the next Term in Dougherty County Bd. of Ed. v. White, 439 U. S. 32 (1978). There, a school board argued *208 that because “it d[id] not meet the definition” of political subdivision in § 14(c)(2), it “d[id] not come within the purview of §5.” Id., at 43, 44. We responded:
“This contention is squarely foreclosed by our decision last Term in [Sheffield]. There, we expressly rejected the suggestion that the city of Sheffield was beyond the ambit of § 5 because it did not itself register voters and hence was not a political subdivision as the term is defined in § 14(c)(2) of the Act. . . . [O]nce a State has been designated for coverage, § 14(c)(2)’s definition of political subdivision has no operative significance in determining the reach of § 5.” Id., at 44 (internal quotation marks omitted).
According to these decisions, then, the statutory definition of “political subdivision” in § 14(c)(2) does not apply to every use of the term “political subdivision” in the Act. Even the intervenors who oppose the district’s bailout concede, for example, that the definition should not apply to §2, which bans racial discrimination in voting by “any State or political subdivision,” 42 U. S. C. § 1973(a). See Brief for Intervenor-Appellee Texas State Conference of NAACP Branches et al. 17 (citing Smith v. Salt River Project Agricultural Improvement and Power Dist., 109 F. 3d 586, 592-593 (CA9 1997)); see also United States v. Uvalde Consol. Independent School Dist., 625 F. 2d 547, 554 (CA5 1980) (“[T]he Supreme Court has held that this definition [in § 14(c)(2)] limits the meaning of the phrase ‘State or political subdivision’ only when it appears in certain parts of the Act, and that it does not confine the phrase as used elsewhere in the Act”). In light of our holdings that the statutory definition does not constrict the scope of preclearance required by § 5, the district argues, it only stands to reason that the definition should not constrict the availability of bailout from those preclearance requirements either.
*209 The Government responds that any such argument is foreclosed by our interpretation of the statute in City of Rome, 446 U. S. 156. There, it argues, we made clear that the discussion of political subdivisions in Sheffield was dictum, and “specifically held that a ‘city is not a “political subdivision” for purposes of §4(a) bailout.’” Brief for Federal Appellee 14 (quoting City of Rome, supra, at 168).
Even if that is what City of Rome held, the premises of its statutory holding did not survive later changes in the law. In City of Rome we rejected the city’s attempt to bail out from coverage under § 5, concluding that “political units of a covered jurisdiction cannot independently bring a § 4(a) bailout action.” 446 U. S., at 167. We concluded that the statute as then written authorized a bailout suit only by a “State” subject to the coverage formula, or a “ ‘political subdivision with respect to which [coverage] determinations have been made as a separate unit,’ ” id., at 164, n. 2 (quoting 42 U. S. C. § 1973b(a) (1976 ed.)); see also 446 U. S., at 163-169. Political subdivisions covered because they were part of a covered State, rather than because of separate coverage determinations, could not separately bail out. As Justice Stevens put it, “[t]he political subdivisions of a covered State” were “not entitled to bail out in a piecemeal fashion.” Id., at 192 (concurring opinion).
In 1982, however, Congress expressly repudiated City of Rome and instead embraced “piecemeal” bailout. As part of an overhaul of the bailout provision, Congress amended the Voting Rights Act to expressly provide that bailout was also available to “political subdivisions” in a covered State, “though [coverage] determinations were not made with respect to such subdivision as a separate unit.” Voting Rights Act Amendments of 1982, §2(b), 96 Stat. 131, codified at 42 U. S. C. § 1973b(a)(l) (emphasis added). In other words, Congress decided that a jurisdiction covered because it was within a covered State need not remain covered for as long *210 as the State did. If the subdivision met the bailout requirements, it could bail out, even if the State could not. In light of these amendments, our logic for denying bailout in City of Rome is no longer applicable to the Voting Rights Act— if anything, that logic compels the opposite conclusion.
Bailout and preclearance under § 5 are now governed by a principle of symmetry. “Given the Court’s decision in Sheffield that all political units in a covered State are to be treated for § 5 purposes as though they were ‘political subdivisions’ of that State, it follows that they should also be treated as such for purposes of §4(a)’s bailout provisions.” City of Rome, supra, at 192 (Stevens, J., concurring).
The Government contends that this reading of Sheffield is mistaken, and that the district is subject to §5 under our decision in Sheffield not because it is a “political subdivision” but because it is a “State.” That would mean it could bail out only if the whole State could bail out.
The assertion that the district is a State is at least counter-intuitive. We acknowledge, however, that there has been much confusion over why Sheffield held the city in that case to be covered by the text of § 5. See City of Rome, 446 U. S., at 168-169; id., at 192 (Stevens, J., concurring); see also Uvalde Consol. Independent School Dist. v. United States, 451 U. S. 1002, 1004, n. 4 (1981) (Rehnquist, J., dissenting from denial of certiorari) (“[T]his Court has not yet settled on the proper construction of the term ‘political subdivision’ ”).
But after the 1982 amendments, the Government’s position is untenable. If the district is considered the State, and therefore necessarily subject to preclearance so long as Texas is covered, then the same must be true of all other subdivisions of the State, including counties. That would render even counties unable to seek bailout so long as their State was covered. But that is the very restriction the 1982 amendments overturned. Nobody denies that counties in a *211 covered State can seek bailout, as several of them have. See Voting Rights Act: Section 5 of the Act — History, Scope, and Purpose: Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., 2599-2834 (2005) (detailing bailouts). Because such piecemeal bailout is now permitted, it cannot be true that §5 treats every governmental unit as the State itself.
The Government’s contrary interpretation has helped to render the bailout provision all but a nullity. Since 1982, only 17 jurisdictions — out of the more than 12,000 covered political subdivisions — have successfully bailed out of the Act. App. to Brief for Jurisdictions That Have Bailed Out as Amici Curiae 3; Dept. of Commerce, Bureau of Census, 2002 Census of Governments, Vol. 1, No. 1, pp. 1, 22-60. It is unlikely that Congress intended the provision to have such limited effect. See United States v. Hayes, 555 U. S. 415, 426-427 (2009).
We therefore hold that all political subdivisions — not only those described in § 14(c)(2) — are eligible to file a bailout suit.
***
More than 40 years ago, this Court concluded that “exceptional conditions” prevailing in certain parts, of the country justified extraordinary legislation otherwise unfamiliar to our federal system. Katzenbach, 383 U. S., at 334. In part due to the success of that legislation, we are now a very different Nation. Whether conditions continue to justify such legislation is a difficult constitutional question we do not answer today. We conclude instead that the Voting Rights Act permits all. political subdivisions, including the district in this ease, to seek relief from its preclearance requirements.
The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.