EDITH BROWN CLEMENT, Circuit Judge,
joined by E. GRADY JOLLY, EDITH H. JONES, JERRY E. SMITH, PRISCILLA R. OWEN, and JENNIFER WALKER ELROD, Circuit Judges, dissenting as to Part II.A:
The Supreme Court has instructed that when a district court’s findings as to discriminatory purpose are “infirm” and “the record permits only one resolution of the factual issue,” we must reverse and render. Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). The plurality discredits “much of the evidence” relied upon by the district court, Op. at 230-31, yet still manages to determine that remand is the proper course. After accounting for the full extent of errors in the district court’s analysis, the record permits only one resolution of the factual issue: Plaintiffs failed to prove that the Texas Legislature passed SB 14 with a discriminatory purpose. Such a resolution mandates that we reverse and render. Accordingly, I dissent.
I.
The district court made infirm findings that rested on legal error in concluding that the Legislature passed SB 14 with a discriminatory purpose. The plurality addresses only some of these errors in a selective and disorderly fashion, failing to conduct the appropriate analysis under the Arlington Heights framework. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).
In conducting the proper analysis, it is important to bear in mind plaintiffs’ heavy burden in imputing discriminatory intent to an entire legislative body. “ ‘Discrimina *323 tory purpose’ ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group.” Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citation and footnote omitted); see also Hunter v. Underwood, 471 U.S. 222, 228, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (explaining that racial discrimination must be a “ ‘substantial’ or ‘motivating’ factor behind enactment of the law”).
First, the district court disproportionately relied on long-ago historical background evidence unrelated to SB 14 to discern a discriminatory purpose by the Legislature. See Veasey v. Perry, 71 F.Supp.3d 627, 632-39, 700 (S.D. Tex. 2014). The most pernicious of the measures cited by the district court predate the passage of the Voting Rights Act in 1965. In fact, despite some bygone history of official discrimination, Texas’s voting practices had so improved by 1965 that it was not included in the original preclearance requirements of the Voting Rights Act. As the plurality must admit, the district court’s heavy reliance on such outdated historical evidence was error. Op. at 230-32; see McCleskey v. Kemp, 481 U.S. 279, 298 n.20, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (noting that historical evidence not “reasonably contemporaneous with the challenged decision” has “little probative value”). Once stripped of error, the remaining historical background evidence on which the district court relied falls woefully short of “demonstrat[ing] a clear and consistent pattern of discriminatory action by the Texas Legislature.” Allstate Ins. Co. v. Abbott, 495 F.3d 151, 160 (5th Cir.2007). There is no substantial contemporary evidence of discrimination, and far from enough evidence to impugn the intentions of the entire Legislature in passing SB 14.
■ Second, the plurality fails to address the “specific sequence of events leading up [to] the challenged decision,” Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555, but an analysis of this factor makes clear that the district court erred. In Arlington Heights, the Supreme Court explained that courts should look to whether, for example, a legislative decision was precipitated by a sudden change in circumstances. See id. at 267 & n.16, 97 S.Ct. 555 (collecting cases and providing example of sudden change in zoning laws after learning of plans to erect integrated housing). Here, the district court relied on evidence that SB 14 became “increasingly harsh” in each successive draft. Veasey, 71 F.Supp.3d at 700. That is not the type of specific-sequence evidence, however, envisioned by the Court in Arlington Heights. The events leading up to the enactment of SB 14 demonstrate that lawmakers were concerned about protecting the integrity of elections, a concern backed by surveys showing that Texas voters of all races agreed with this goal and supported requiring photo IDs to vote. There is no evidence of sudden changed circumstances; in fact, the district court noted that SB 14 was debated over a lengthy six-year period. Id.
Third, the plurality claims that certain procedural departures by the Legislature provide a “potential link” in the “circumstantial totality of evidence” of possible discriminatory purpose. Op. at 237. But, as the plurality concedes, “context matters.” Id. Viewed in the appropriate context, the procedural maneuvers employed by the Legislature occurred precisely because opponents of the legislation — several of whom are the very parties who brought this lawsuit — blocked three earlier itera *324 tions of voter ID legislation over the course of several years. While the Legislature made some departures from its normal procedural sequence in passing SB 14, these departures are easily explained as a way to avoid the obstructive tactics that had repeatedly defeated voter ID bills in past sessions. In other words, the political effectiveness of SB 14’s opponents precipitated the Legislature’s procedural departures.
The plurality makes much of the Legislature’s passage of SB 14 in the midst of other “pressing matters of great importance to Texas.” Op. at 239. In doing so, the plurality only feigns deference to the legislative process by claiming that the Legislature “is entitled to set whatever priorities it wishes.” Id. at 238. We are not entitled to supplement our policy preferences for that of the Legislature, and speculation such as what “one might expect” a legislature to do, id is not evidence of discriminatory purpose. It would be improper for the district court to infer discriminatory intent on behalf of the Legislature by second guessing legislative priorities. See Arlington Heights, 429 U.S. at 265, 97 S.Ct. 555 (“[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.”).
Fourth, the State’s purposes in passing SB 14 were protecting the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process— motives that are unquestionably legitimate. See Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 196, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (“There is no question about the legitimacy or importance of the State’s interest in counting only the votes of eligible voters.... While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.”). The fit between the law’s goals and provisions does not show it was enacted with discriminatory intent.
Fifth, the district court identified no reliable legislative history or contemporary statements that reveal discriminatory purpose. “The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.” Arlington Heights, 429 U.S. at 268, 97 S.Ct. 555. “In some extraordinary instances the members might be called ... to testify concerning the purpose of the official action ....” Id. As the Supreme Court has long recognized, however, “[placing a de-cisionmaker on the stand is ... ‘usually to be avoided’ ” because “judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government.” Id. at 268 n.18, 97 S.Ct. 555.
The district court relied in large part on accusations by the bill’s opponents about proponents’ motives. See Veasey, 71 F.Supp.3d at 655-57. Such biased conjecture cannot form the basis of a finding of discriminatory intent by the entire Legislature. See United States v. O’Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (“What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.”).
Despite discrediting this unreliable evidence, the plurality still determines that “circumstantial evidence ... could support a finding of discriminatory purpose.” Op. at 235. The primary evidence cited by the plurality is that “[t]he record shows that drafters and proponents of SB 14 were *325 aware of the likely disproportionate effect of the law on minorities ....” Id. at 236. The plurality further cites a “backdrop of warnings that SB 14 would have a disparate impact on minorities.” Id. at 239. The plurality misunderstands the law: the Supreme Court has made clear that mere awareness of a disparate impact (even assuming arguendo it existed here) is not enough to prove discriminatory intent. Feeney, 442 U.S. at 279, 99 S.Ct. 2282 (holding discriminatory purpose requires more than “awareness of consequences”; legislature must have “selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group”); Price v. Austin Indep. School Dist., 945 F.2d 1307, 1319 (5th Cir.1991) (“Feeney stands directly for the proposition that foreseeability of discriminatory impact, without more, does not constitute the forbidden discriminatory purpose.”). The plurality’s mistaken understanding of the law only encourages further “infirm” findings based on “an erroneous view of the law” by the district court, whose reasoning and findings even the plurality now roundly discredits. Pullman-Standard, 456 U.S. at 292,102 S.Ct. 1781.
The plurality also overlooks the total absence of direct evidence of a discriminatory purpose and the effect of plaintiffs’ failure to unearth such evidence — despite repeated assertions that such evidence exists. The district court allowed plaintiffs to develop an extensive discovery record that included thousands of documents, numerous and lengthy depositions, and confidential email communications, all on plaintiffs’ assertion that such discovery would offer critical evidence of discriminatory motive. In the end, this intrusive search — typically reserved only for “extraordinary” cases— yielded no such evidence. See Arlington Heights, 429 U.S. at 268, 97 S.Ct. 555. Despite no smoking gun that would show discriminatory intent in the voluminous evidence, the plurality asserts that we should instead look to circumstantial evidence to infer intent, as an “invidious purpose” may be “hiding.” Op. at 240-41. The Court in Arlington Heights noted the need to consider circumstantial evidence in cases where testimony by the actual decision-makers was “barred by privilege.” 429 U.S. at 268, 97 S.Ct. 555. But, as we found in Price v. Austin Independent School District, where decisionmakers are called to testify about their actions and “the justifications advanced in their testimony do not demonstrate a pretext for intentionally discriminatory actions, the logic of Arlington Heights suggests that the [direct] evidence ... is actually stronger than the circumstantial evidence proffered by the plaintiffs.” 945 F.2d at 1318. Here too, the direct evidence, and plaintiffs’ failure to demonstrate discriminatory purpose from it, overwhelmingly favor a finding of no discriminatory intent. As the panel correctly noted, it is rather unlikely that a discriminatory motive “would permeate a legislative body and not yield any private memos or emails.” Veasey v. Abbott, 796 F.3d 487, 503 n.16 (5th Cir.2015), reh’g en banc granted, 815 F.3d 958.
The Supreme Court has recognized the gravity of judicial inquiries into alleged improper motives by a legislative body. O’Brien, 391 U.S. at 383-84, 88 S.Ct. 1673 (stating that judicial “[i]nquiries into congressional motives or purposes are a hazardous matter” and the “stakes are ... high”). The plurality takes lightly the aspersions it casts on the Legislature by allowing such a weak evidentiary record to potentially support a finding of racial animus. When there is no “proof that a discriminatory purpose has been a motivating factor in the decision,” as is the case here, we owe “judicial deference.” Arlington Heights, 429 U.S. at 265-66, 97 S.Ct. 555. *326 The plurality abjures such deference and encourages witch hunts for racism.
II.
The record permits only one conclusion in this inquiry after applying the appropriate legal standards and discounting the infirm findings by the district court: Plaintiffs have not proven that the Texas Legislature acted with a discriminatory intent in enacting SB 14. See Pullman-Standard, 456 U.S. at 292, 102 S.Ct. 1781. Despite extensive discovery of legislators’ private materials, plaintiffs have brought forth no direct evidence of discriminatory intent. What evidence remains, after accounting for the district court’s errors, does not suffice to conclude that SB 14 was enacted “ ‘because of,’ not merely ‘in spite of,’ ” a disparate impact on minorities. Feeney, 442 U.S. at 279, 99 S.Ct. 2282.
The record below was fully developed. Because plaintiffs “simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the [Legislature’s] decision,” the district court should not be allowed to conduct any reweighing of the evidence. Arlington Heights, 429 U.S. at 270-71, 97 S.Ct. 555. There is no reason to permit plaintiffs— who have not carried their burden — another opportunity to prove their case. See id. at 271, 97 S.Ct. 555 (“This conclusion ends the constitutional inquiry.”). Unfortunately, the plurality chooses to provide plaintiffs another chance and leaves the district court with a disorganized, piecemeal analysis of the Arlington Heights factors that confuses the law and offers no clear direction on remand.
For these reasons, I would reverse the district court’s holding as to discriminatory purpose and render judgment for the State on this claim.
JENNIFER WALKER ELROD, Circuit Judge,
joined by SMITH, Circuit Judge, concurring in part and dissenting in part:
I dissent from all but Part IV of Judge Haynes’s opinion.[1] I agree with Judge Jones’s opinion that, despite wide-reaching and invasive discovery into legislators’ internal correspondence, there is no record evidence that any legislator — much less the Texas Legislature as a whole— had a racially discriminatory purpose in enacting SB 14. The extensive history of obstruction by opponents of voter ID legislation accounts for the procedures employed to ensure passage of SB 14, and none of the circumstantial evidence relied on by Judge Haynes’s opinion suggests that the Legislature acted on the basis of *327 racism.[2] Judgment therefore should be rendered in favor of the State on Plaintiffs’ discriminatory purpose claim.
Plaintiffs’ claim that SB 14 violates the “results test” of Section 2 of the Voting Rights Act also fails. SB 14 does not “result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.” 52 U.S.C. § 10301(a).
[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant’s policy or policies causing that disparity. A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create.
Texas Dep’t of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., — U.S. -, 135 S.Ct. 2507, 2523, 192 L.Ed.2d 514 (2015) (internal alterations, quotation marks, and citation omitted). I agree with Judge Jones’s opinion and Judge Easter-brook’s opinion for the Seventh Circuit that the Gingles[3] factors — an unranked list of nonexclusive considerations that lend themselves to manipulation — are unhelpful in this context.[4] See Frank v. Walker, 768 F.3d 744, 755 (7th Cir.2014) (expressing skepticism about application of Gingles factors to voter ID provision, because Gingles “does not distinguish discrimination by the defendants from other persons’ discrimination. In vote-dilution cases, the domain of Gingles, the government itself draws the district lines; no one else bears responsibility.”), cert. denied, — U.S. -, 135 S.Ct. 1551, 191 L.Ed.2d 638 (2015).
Moreover, Plaintiffs’ § 2 claim fails even if we consider the Gingles factors. SB 14 has been tested many times and there is no evidence in this record that any voter has been denied the right to vote on the basis of his or her race because of its voter ID requirements.[5] Plaintiffs’ claim rests *328 principally on the unfortunate socioeconomic disparities that exist among various racial groups in Texas as elsewhere, but Judge Haynes’s opinion fails to establish any link between these disparities and any contemporary discrimination by the State of Texas.
The Voting Rights Act rests on Congress’s authority to enact “appropriate legislation” to enforce the guarantees of the Fifteenth Amendment. Shelby Cty., Ala. v. Holder, — U.S. -, 133 S.Ct. 2612, 2619, 186 L.Ed.2d 651 (2013); South Carolina v. Katzenbach, 383 U.S. 301, 325-26, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); U.S. Const. amend. 15 §§ 1-2. The use of that power “must be justified by current needs.” Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 203, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009). The examples of decades-old state discrimination relied on by Plaintiffs are unavailing. See Shelby Cty., 133 S.Ct. at 2622, 2627 (explaining that the Voting Rights Act “imposes current burdens and must be justified by current needs” and rejecting reliance on “decades-old data and eradicated practices”). Nor does the existence of societal economic disparities render SB 14 unlawful. See Frank, 768 F.3d at 753 (“Section 2(a) forbids discrimination by ‘race or color’ but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters.”).
The contrary approach taken by Judge Haynes’s opinion improperly would permit challenges to virtually all aspects of the voting process simply because poverty adds to the burdens of everyday activities and wealth distribution is unequal across racial groups. This distorts the § 2 analysis and raises serious constitutional questions. Cf. Inclusive Cmties., 135 S.Ct. at 2524 (“Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations” into government decision-making.).
The Supreme Court has explained that for most voters, the burdens associated with obtaining photo ID in order to vote “surely do[] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.” Crawford, 553 U.S. at 198, 128 S.Ct. 1610 (upholding Indiana’s voter ID law). The requirements imposed by SB 14 are not outside the usual inconveniences expected of citizens exercising their right to vote, and, as in Crawford, they provide no basis for overturning a race-neutral law by which the State seeks to prevent in-person voter fraud. See id. at 196, 128 S.Ct. 1610 (“[T]he interest in orderly administration and accurate record-keeping provides a sufficient justification for carefully identifying all voters participating in the election process.”).
Simply put, Plaintiffs have not shown that SB 14 had any effect on voter turnout, that any disparity in ID possession among racial groups was caused by SB 14, or that a single Texan is prevented from voting by SB 14. Accordingly, I would vacate the district court’s opinion and render judgment for the State.

. Part IV of Judge Haynes's opinion correctly vacates the district court’s opinion and renders judgment in the State's favor on Plaintiffs' claim that SB 14 imposes an unconstitutional poll tax. Part III of Judge Haynes’s opinion vacates the district court’s ruling on Plaintiffs First and Fourteenth Amendment claims. I agree that those claims should be vacated. Because I do not agree with the treatment of the Voting Rights Act claims in Judge Haynes's opinion, I would reach the First and Fourteenth Amendment claims and reverse. The First and Fourteenth Amendment claims fail because Plaintiffs have not shown SB 14 "imposes 'excessively burdensome requirements’ on any class of voters....” Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 202, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (quoting Storer v. Brown, 415 U.S. 724, 738, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)) (upholding Indiana’s voter ID requirements against Fourteenth Amendment challenge); see also Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ("[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify’ the restrictions.” (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992))).

. Judge Costa's opinion blurs the line between discriminatory intent and discriminatory effect. Even when a legislature acts to disadvantage an opposition party, the mere correlation between party membership and race does not create a Voting Rights Act or Equal Protection claim. "Because of” means because of. See Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("[Discriminatory purpose] implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part ‘because of,' not merely 'in spite of,’ its adverse effects upon an identifiable group.”).

. Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

. The malleability of the Gingles test is visible in its implementation: different courts purporting to apply the Gingles factors seem to conduct very different analyses. Compare Ohio State Conference of NAACP v. Husted, 768 F.3d 524, 556-60 (6th Cir.2014) (relying on Gingles as second step of a two-part test dependent on socioeconomic factors and historic voting practices), vacated as moot by 2014 WL 10384647 (6th Cir. Oct. 1, 2014), and League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 241-44 (4th Cir. 2014) (relying on Gingles as second step of a two-part test dependent on sweeping contextual analysis of pre-VRA history and details of challenged bill’s passage), mandate stayed,U.S. -, 135 S.Ct. 6, 190 L.Ed.2d 243 (2014), cert. denied, -U.S. -, 135 S.Ct. 1735, 191 L.Ed.2d 702 (2015), with Gonzalez v. Arizona, 677 F.3d 383, 405-07 (9th Cir.2012) (en banc) (citing some but not all of the Gingles factors without reference to a two-part test); see also N.C. State Conference of NAACP v. McCrory,-F.Supp.3d-,- -, No. 1:13-cv-658, 2016 WL 1650774, at *76-*80 (M.D.N.C. Apr. 25, 2016) (collecting cases). The validity of a state's voting laws ought not to rely on the outcome of a judicial Rorschach lest.

.To establish a § 2 claim, Plaintiffs must first show that SB 14 abridges or denies an individual's ability to vote. After an exhaustive *328 statewide search, Plaintiffs identified three individuals who could not vote at one time because they lacked qualifying ID. None is now prevented from voting. Two of the three individuals are eligible to vote by mail and the third has subsequently obtained a free election ID card. Out of the entire state of Texas, Plaintiffs have not produced anyone who cannot vote today because of SB 14's requirements. The burden to prove discriminatory effect lies with Plaintiffs. Without a denial or abridgement, no § 2 claim can stand.