# United States Court of Appeals
## For the First Circuit

No. 14-1300

MARY C. MAYHEW, in her capacity as Secretary of
the Maine Department of Health and Human Services,

Petitioner,

v.

SYLVIA M. BURWELL, in her capacity as Secretary of
the U.S. Department of Health and Human Services,

Respondent,

and

JANET T. MILLS, in her capacity as Attorney General of Maine,

Intervenor.

PETITION FOR REVIEW FROM A DECISION OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES

Before

Lynch, Chief Judge,
Selya and Barron, Circuit Judges.

Clifford H. Ruprecht, with whom Christopher T. Roach, Geraldine G. Sanchez, and Roach, Hewitt, Ruprecht, Sanchez & Bischoff, P.C. were on brief, for petitioner.
Alisa B. Klein, Appellate Staff Attorney, with whom Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Appellate Staff Attorney, Stuart F. Delery, Assistant Attorney General, William B. Schultz, General Counsel, Janice L. Hoffman, Associate General Counsel, Susan Maxson Lyons, Deputy Associate General Counsel for Litigation, and Bridgette Kaiser were on brief, for respondent.
Christopher C. Taub, Assistant Attorney General, with whom Janet T. Mills, Attorney General, was on brief, for intervenor.

Martha Jane Perkins, Catherine McKee, and Jack Comart on brief for National Health Law Program, Maine Equal Justice Partners, Maine Psychological Association, Maine Chapter of the American Academy of Pediatrics, Maine Medical Association, Preble Street, Maine Children's Alliance, and Young Invincibles, amici curiae.

---

November 17, 2014

---

**LYNCH, <u>Chief Judge</u>**.  After providing Medicaid coverage for over 20 years for 19- and 20-year old children whose families met low-income requirements, in 2012, Maine DHHS[1] sought to drop that coverage by proposing an amendment to its Medicaid state plan. The federal Department of Health and Human Services (DHHS) Secretary disapproved the amendment, stating that it plainly violates a federal statute, 42 U.S.C. § 1396a(gg), part of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).  Section 1396a(gg) requires states accepting Medicaid funds to maintain their Medicaid eligibility standards for children until October 1, 2019.

Maine DHHS now petitions for review, arguing that the federal disapproval is unconstitutional.  It says that under portions of <u>National Federation of Independent Businesses</u> v. <u>Sebelius</u> (<u>NFIB</u>), 132 S. Ct. 2566 (2012), § 1396a(gg) as applied here is unconstitutionally coercive in violation of the Spending Clause and, independently, that it violates Maine's right to equal

---

[1]  "Maine DHHS," as used in this opinion, refers to petitioner Mary C. Mayhew, in her capacity as Secretary of the Maine Department of Health and Human Services.  Maine DHHS has petitioned for judicial review of the decision of the U.S. Department of Health and Human Services disapproving Maine's proposed state plan amendment.  Maine's Attorney General has declined to represent Maine DHHS in this lawsuit, citing "strong[]" disagreements with the state agency "as a matter of law and public policy."  The Maine Attorney General authorized outside counsel for Maine DHHS and has intervened in this suit on the side of respondent Sylvia Burwell, in her capacity as Secretary of the U.S. DHHS.

sovereignty as recognized in <u>Shelby County</u> v. <u>Holder</u>, 133 S. Ct. 2612 (2013), and like cases.

The United States says the statute as applied here is constitutional, fitting easily within congressional spending power to condition federal Medicaid grants. The Attorney General of Maine, Janet T. Mills, as interested party-intervenor, argues that the rejection of Maine DHHS's proposed amendment is constitutional. And amici health professionals explain the history and importance of the Medicaid health care provisions for this age group.[2]

For the reasons that follow, we hold that the statute is constitutional as applied here.

## I. Background

The Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u>, first enacted in 1965, provides federal funds to states to assist them in paying for the medical care of needy individuals. <u>NFIB</u>, 132 S. Ct. at 2581. The Secretary of the U.S. DHHS administers the Medicaid program through the Centers for Medicare and Medicaid Services (CMS). <u>Ark. Dep't of Health & Human Servs.</u> v. <u>Ahlborn</u>, 547 U.S. 268, 275 (2006).

"States are not required to participate in Medicaid, but all of them do." <u>Id.</u> Maine began participating in Medicaid in 1966, shortly after the program's inception. <u>See</u> U.S. Advisory

_____

[2] We express our appreciation to the amici for their assistance.

-4-

Comm'n on Intergovernmental Relations, <u>Intergovernmental Problems in Medicaid</u> 19 (1968), <u>available at</u> http://digital.library.unt.edu/ark:/67531/metadc1397/m1/35/?q=maine.  "In order to receive [Medicaid] funding, States must comply with federal criteria governing matters such as who receives care and what services are provided at what cost."  <u>NFIB</u>, 132 S. Ct. at 2581.  To this end, "States must submit to . . . CMS . . . a state Medicaid plan that details the nature and scope of the State's Medicaid program. [States] must also submit any amendments to the plan that [they] may make from time to time.  And [they] must receive the agency's approval of the plan and any amendments."  <u>Douglas</u> v. <u>Indep. Living Ctr. of S. Cal., Inc.</u>, 132 S. Ct. 1204, 1208 (2012).  CMS reviews the states' plans and their proposed amendments "to determine whether they comply with the statutory and regulatory requirements governing the Medicaid program."  <u>Id.</u> (citing 42 U.S.C. §§ 1316(a)(1), (b), 1396a(a), (b); 42 C.F.R. § 430.10 <u>et seq.</u>).

When Congress passed the Medicaid Act, it expressly reserved "[t]he right to alter, amend, or repeal any provision" of the Medicaid statute.  <u>NFIB</u>, 132 S. Ct. at 2605 (quoting 42 U.S.C. § 1304).  It has exercised that power.  Congress has, in fact, provided greater Medicaid eligibility on numerous occasions.  From the start, the Act has mandated coverage for certain children, and over time it has increased the eligibility by changing age and income requirements.  <u>See</u> Social Security Amendments of 1965, Pub.

-5-

L. No. 89-97, sec. 121(a), § 1902(b), 79 Stat. 286, 348 (codified at 42 U.S.C. § 1396a(b) (1969)). For example, approximately 25 years ago, "Congress required participating States to include among their beneficiaries pregnant women with family incomes up to 133% of the federal poverty level, children up to age 6 at the same income levels, and children ages 6 to 18 with family incomes up to 100% of the poverty level." NFIB, 132 S. Ct. at 2631 (Ginsburg, J., dissenting).

Before the expansion of Medicaid effected by the ACA in 2010, Medicaid did not require states to cover non-pregnant, non-disabled children ages 18 to 20 as a condition of participation in the program, but it permitted states to do so at the state's option. See 42 U.S.C. § 1396d(a)(i). States which chose to do so were required to provide the same mandatory benefits to children aged 18 to 20 as they provided for other children.

From 1991 to the present, Maine's Medicaid program, MaineCare, has provided Medicaid coverage to low-income individuals aged 18 to 20. Although considered "children" for Medicaid purposes, such individuals are otherwise considered "adults" under Maine law. See Me. Rev. Stat. tit. 1, §§ 72(1), 73. MaineCare makes up a major portion of Maine's annual outlays, accounting for just over one-third of the state's total budget in 2013.[3]

_____

[3] Maine's total state and federal Medicaid expenditures for fiscal year 2012 were $2.4 billion. According to Attorney General Mills, coverage for 19- and 20-year-olds (the group for which Maine

In 2009, as part of the American Recovery and Reinvestment Act (ARRA), Pub. L. No. 111-5, 123 Stat. 115 (2009), Congress offered stimulus funds to states which agreed to maintain their Medicaid eligibility criteria at July 1, 2008 levels until December 31, 2010. Id. § 5001(f)(1)(A), (h)(3), 123 Stat. at 500, 502. Two of the purposes of the ARRA were to "preserve and create jobs and promote economic recovery" and to "stabilize State and local government budgets, in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases." Id. § 3(a), 123 Stat. at 115–16. Maine accepted those funds and the concordant conditions, which included continuing to provide coverage to low-income 18- to 20-year-olds until December 31, 2010.

The ACA, enacted on March 23, 2010, contains a "maintenance-of-effort" (MOE) provision, now codified at 42 U.S.C. § 1396a(gg), which provides, in relevant part, that states, in order to continue receiving Medicaid funds,

> shall not have in effect eligibility standards, methodologies, or procedures . . . that are more restrictive than the eligibility standards, methodologies, or procedures, respectively . . . that [as of March 23, 2010] are applicable to determining the eligibility for medical assistance of any child who is under 19 years of age (or such higher age as the State may have elected).

sought to repeal coverage) represented less than two percent of that figure.

Maine had elected to cover 18- to 20-year-olds. The requirement of the MOE provision is in effect until October 1, 2019. 42 U.S.C. § 1396a(gg)(2). In other words, beginning March 23, 2010, in order to continue receiving those Medicaid funds they had received for this population, states were required to "freeze" their eligibility standards for children for a period of approximately nine years. Those "standards" included Maine's provision of coverage for 18- to 20-year-olds.

In short, in 2009, Maine agreed to continue providing coverage, as it had since 1991, for low-income individuals aged 18 to 20 through 2010 as a condition of receiving federal stimulus funds under the ARRA. The ACA in 2010 then required Maine to continue doing so for another nine years as a condition of receiving Medicaid funds. Maine DHHS complains that it did not have an opportunity to restrict its eligibility standards for children after it accepted funds under the ARRA but before the ACA went into effect.

Maine is required by its state constitution to have a balanced budget. See Me. Const. art. 5, pt. 3d, § 5; id. art. 9, § 14. Faced with a budget deficit in 2012, Maine's governor proposed eliminating MaineCare eligibility for 19- and 20-year-olds not otherwise covered by Medicaid. The legislature voted in favor of that elimination of coverage, among other budget cuts. Maine DHHS projected that removing 19- and 20-year-olds from the program

would save Maine $3.7 million but cause the state to lose $6.9 million in federal funds.

In August 2012, Maine DHHS submitted a state plan amendment to the U.S. DHHS that eliminated coverage of 19- and 20-year-olds, among other changes. On January 7, 2013, CMS issued an initial decision allowing most other cuts but declining to approve Maine DHHS's amendment as to eliminating coverage for 19- and 20-year-olds because it did not comply with § 1396a(gg). CMS rejected Maine DHHS's arguments that the MOE provision was an unconstitutional exercise of Congress's spending power under the Supreme Court's decision in NFIB. CMS, on reconsideration, affirmed the disapproval of the state plan amendment, this time simply stating that the proposed amendment was inconsistent with the MOE provision and that the agency did not have the authority to adjudicate the constitutional questions raised by Maine DHHS. This petition for judicial review followed.

Maine DHHS brings a twofold constitutional challenge to the MOE provision before us. First, it renews its argument that the MOE provision is unconstitutional under the Spending Clause. Second, it contends for the first time that the MOE provision violates the doctrine of equal sovereignty as articulated in Shelby County v. Holder, 133 S. Ct. 2612 (2013).

We review these constitutional challenges de novo. See 5 U.S.C. § 706 (court reviewing agency action must "decide all

relevant questions of law" and "interpret constitutional and statutory provisions," and shall "set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity"); see also United States v. Rene E., 583 F.3d 8, 11 (1st Cir. 2009) (review of constitutional challenge to a federal statute is de novo).[4]

---

[4] We asked the parties to provide supplemental briefing on the issue of whether we have jurisdiction to address Maine DHHS's constitutional claims, even though the agency did not address those claims because it disclaimed the "authority to render decisions regarding the constitutionality of congressional enactments."

After reviewing the parties' arguments, we conclude that we have jurisdiction. Under 42 U.S.C. § 1316(a), "[a]ny State which is dissatisfied with a final determination made by the Secretary on . . . reconsideration" regarding approval of the state's Medicaid plan may "file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination. . . . The court shall have jurisdiction to affirm the action of the Secretary or to set it aside, in whole or in part." The Supreme Court has approved of the "appellate court[s'] reviewing the decision of an administrative agency to consider a constitutional challenge to a federal statute that the agency concluded it lacked authority to decide." Elgin v. Dep't of Treasury, 132 S. Ct. 2126, 2137-38 n.8 (2012) (collecting cases). In Preseault v. ICC, 853 F.2d 145 (2d Cir. 1988), one of the cases cited in the Elgin footnote, the court, in the course of reviewing an agency's decision, held that it had jurisdiction over a challenge to the constitutionality of the statute under which the agency acted, even though the claim was presented for the first time on appeal. Preseault, 853 F.2d at 148-49. The Preseault court rejected the agency's argument that the petitioners' constitutional challenge should be brought in federal district court in the first instance, concluding that "it would be nonsensical to require a bifurcated challenge, relegating the constitutional challenge to the statute to a district court" that did not have jurisdiction over the review of the underlying agency proceeding. Id. at 149. We find Preseault's analysis persuasive. Under § 1316(a), we have jurisdiction to review the U.S. DHHS's disapproval of Maine DHHS's state plan amendment, and that jurisdiction encompasses the power to adjudicate Maine DHHS's constitutional challenges to § 1396a(gg).

## II.  Spending Clause Challenge

"The Spending Clause grants Congress the power 'to pay the Debts and provide for the . . . general Welfare of the United States.'"  NFIB, 132 S. Ct. at 2601 (quoting U.S. Const. art. I, § 8, cl. 1).  Maine DHHS argues that application of § 1396a(gg) in these circumstances exceeds Congress's power under the Spending Clause for two reasons: (1) it is unconstitutionally coercive under NFIB and (2) it violates the anti-retroactivity principle of Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17, 25 (1981).  NFIB itself shows that both of these contentions are without merit.  The MOE provision is analogous to past modifications of Medicaid that NFIB deemed constitutionally permissible.

A.        NFIB v. Sebelius and the Spending Clause

In NFIB, the Supreme Court considered constitutional challenges to two provisions of the ACA: to the individual mandate, which required most Americans to maintain a minimum level of health insurance coverage, and to the significant expansion of the Medicaid program, which required states to provide specified health care to all individuals with incomes below 133 percent of the poverty level (but at a higher federal financial participation rate) as a condition of the state's continued participation in Medicaid.  132 S. Ct. at 2577, 2582.  In a fractured decision, the Court upheld the individual mandate as a permissible exercise of

-11-

Congress's taxing power, but found severable and struck down as beyond Congress's Spending Clause authority the provision penalizing states that did not participate in the new expansion of the Medicaid funding with the loss of all Medicaid funding. Id. at 2608. The Court struck down only the penalty for noncompliance, not the expansion itself. Id. at 2607. That is, the Court held that the U.S. DHHS could not condition the granting of all federal Medicaid funds on a state's participation in the new expanded program, but was permitted to condition funds for the new expanded program on participation in the new program. The Court made this explicit:

> Nothing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use. What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing Medicaid funding.

Id.[5]

---

[5] Maine has opted not to participate in the Medicaid expansion. In June 2013, Maine's legislature passed a bill that would have expanded the state's Medicaid program in order to receive the additional federal funding offered under the ACA. LD 1066, 126th Leg., 1st Reg. Session (Me. 2013). Maine's governor vetoed the bill, and the legislature failed to pass it over his veto. Id.; An Act to Increase Access to Health Coverage and Qualify Maine for Federal Funding: Roll Call Vote #339, 126th Leg., 1st Reg. Session (Me. 2013); The Advisory Board Company, Where the States Stand on Medicaid Expansion, Daily Briefing (Sep. 4, 2014), http://www.advisory.com/daily-briefing/resources/primers/medicaid map.

Seven Justices concluded that the penalty of taking away existing Medicaid funding from states which declined to sign up for the new expanded Medicaid program was unconstitutional, but they were unable to agree on a single or consistent rationale.  Chief Justice Roberts, in a plurality opinion joined by Justice Breyer and Justice Kagan, offered one rationale for that holding.  A joint dissent authored by Justice Scalia, Justice Kennedy, Justice Thomas, and Justice Alito offered another.

    1.  The plurality's approach

The plurality began its analysis by noting that the Medicaid expansion of the ACA "dramatically increase[d] state obligations under Medicaid."  Id. at 2601.  Under the pre-ACA system, states were required "to cover only certain discrete categories of needy individuals -- pregnant women, children, needy families, the blind, the elderly, and the disabled."  Id. (citing 42 U.S.C. § 1396a(a)(10)).  The Medicaid program expansion, "in contrast, require[d] States to expand their Medicaid programs . . . to cover all individuals under the age of 65 with incomes below 133 percent of the federal poverty line."  Id. (citing 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII)).[6]

---

[6]    The Medicaid program expansion was projected to increase federal Medicaid spending by $434 billion in its first six years. Reply Br. of State Pet'rs on Medicaid at 19, Florida v. U.S. Dep't of Health & Human Servs., 132 S. Ct. 2763 (2012) (No. 11-400), 2012 WL 864598 at *19.

The plurality reiterated the longstanding rule that Congress may use its power under the Spending Clause to condition federal grants to states "upon the States' 'taking certain actions that Congress could not require them to take.'" Id. (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686 (1999)). But, in order for an exercise of the spending power to be deemed legitimate, the state must "voluntarily and knowingly" accept the terms of the deal. Id. at 2602 (quoting Pennhurst, 451 U.S. at 17). Put differently, "Congress may use its spending power to create incentives for States to act in accordance with federal policies," but it oversteps its authority "when 'pressure turns into compulsion.'" Id. (quoting Charles C. Steward Mach. Co. v. Davis, 301 U.S. 548, 590 (1937)). This limit on Congress's spending power is necessary to "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." Id.

The plurality opinion reasoned that, while Congress is entitled to "condition the receipt of funds on the States' complying with restrictions on the use of those funds" in order to "ensure[] that the funds are spent according to [Congress's] view of the 'general Welfare,'" when Congress places conditions on funds that do not govern the use of those funds, "the conditions are properly viewed as a means of pressuring the States to accept policy changes." Id. at 2603-04. The plurality determined that

-14-

the latter situation obtained with respect to the Medicaid program expansion.  That expansion, Chief Justice Roberts explained,

> accomplishe[d] a shift in kind, not merely degree.  The original program was designed to cover medical services for four particular categories of the needy: the disabled, the blind, the elderly, and needy families with dependent children. . . .  Previous amendments to Medicaid eligibility merely altered and expanded the boundaries of these categories. Under the [ACA], Medicaid . . . is no longer a program to care for the neediest among us, but rather an element of a comprehensive national plan to provide universal health insurance coverage.

Id. at 2605-06.  The plurality viewed the Medicaid expansion as creating an entirely "new health care program," participation in which was a condition of states receiving even continued funding for an old program (pre-ACA Medicaid).  See id. at 2606.  This meant that the Medicaid expansion was a condition upon the receipt of funds that did not govern the use of those funds.

The plurality next considered "whether 'the financial inducement offered by Congress' [as to the new program expansion] was 'so coercive as to pass the point at which  pressure turns into compulsion.'"  Id. at 2604 (quoting South Dakota v. Dole, 483 U.S. 203, 211 (1987)) (internal quotation marks omitted).  The precedent for this portion of the analysis was the Court's decision in Dole. Dole had considered whether Congress's threat to withhold five percent of a state's federal highway funds if the state did not raise its minimum drinking age to 21 was permissible under the

Spending Clause. Dole, 483 U.S. at 211. Dole held that it was permissible. Id. at 211-12. The NFIB plurality distinguished Dole, saying while "the condition was not a restriction on how the highway funds . . . were to be used," it was "not impermissibly coercive, because Congress was offering only 'relatively mild encouragement to the States.'" NFIB, 132 S. Ct. at 2604 (quoting Dole, 483 U.S. at 211).

By contrast, the plurality found that the financial inducement and penalty in the new Medicaid program expansion was "much more than 'relatively mild encouragement' -- it [was] a gun to the head." Id. Importantly, the plurality expressly acknowledged that Congress is permitted to modify the Medicaid program, and to condition states' continuing participation in Medicaid upon compliance with those modifications, as it has done on numerous occasions in the past. Id. at 2605.[7]

The plurality found that the new Medicaid program expansion was much more than a simple modification -- it was a "dramatic[]" "transform[ation]" of the program. NFIB, 132 S. Ct. at 2605-06. States could not have anticipated that their

_____

[7] That was in accord with settled law, see California v. United States, 104 F.3d 1086, 1092 (9th Cir. 1997); Stowell v. Ives, 976 F.2d 65, 69 (1st Cir. 1992); Oklahoma v. Schweiker, 655 F.2d 401, 413-14 (D.C. Cir. 1981), and the NFIB Court did nothing to unsettle that law. See also 42 C.F.R. § 430.12(c)(1) (state plan "must provide that it will be amended whenever necessary to reflect . . . [c]hanges in Federal law, regulations, policy interpretations, or court decisions").

entitlement to Medicaid funds would become conditioned on providing new medical care to all individuals with incomes below 133 percent of the poverty line. Id. Thus, the new Medicaid program expansion violated the "anti-retroactivity" rule of Pennhurst, which provides that Congress may not "surpris[e]" states participating in a federal-state cooperative program "with post-acceptance or 'retroactive' conditions." Id. (quoting Pennhurst, 451 U.S. at 25).

## 2. The joint dissent's approach

The joint dissent's analysis of the constitutionality of the Medicaid expansion differed significantly from that of the plurality. The primary[8] focus of the joint dissent was on the concept of "coercion," which it defined simply: "[I]f States really have no choice other than to accept the package, the offer is coercive, and the conditions cannot be sustained under the spending power." Id. at 2661 (Scalia, Kennedy, Thomas & Alito, JJ., dissenting). The Justices cautioned, however, that "courts should not conclude that legislation is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear." Id.

---

[8] The joint dissent also noted that conditions attached to grants must be unambiguous, must be "related to the federal interest in particular national projects or programs," and "may not induce the States to engage in activities that would themselves be unconstitutional." NFIB, 132 S. Ct. at 2659 (Scalia, Kennedy, Thomas & Alito, JJ., dissenting) (citations omitted) (internal quotation marks omitted). These criteria support the constitutionality of § 1396a(gg) here.

at 2662. Emphasizing that Medicaid constitutes the largest line item in states' budgets, as well as the apparent view of Congress that no state would refuse to participate in the new Medicaid program expansion, the joint dissent concluded that the expansion exceeded Congress's power under the Spending Clause. Id. at 2662–66.

B.      Application of NFIB to the Disapproval Here Based on § 1396a(qq)

When a majority of the Supreme Court agrees on a result but "no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). In NFIB, the plurality invalidated the Medicaid expansion on narrower grounds than did the joint dissent. The plurality found a Spending Clause violation because it determined that the Medicaid program expansion was an entirely new program, participation in which was a condition on continued receipt of pre-ACA Medicaid funds, and because the loss of pre-ACA Medicaid funds would have been so consequential to the states that states had no real option to refuse. In other words, the plurality found (1) that the expansion placed a condition on the receipt of funds that did not govern the use of those funds and (2) that the condition was unduly coercive. The joint dissent, in contrast,

-18-

would have invalidated the expansion based on a finding of coercion alone. Hence, the plurality's rationale was narrower. See E. Pasachoff, Conditional Spending After NFIB v. Sebelius: The Example of Federal Education Law, 62 Am. U. L. Rev. 577, 593-96 (2013); cf. S. Bagenstos, The Anti-Leveraging Principle and the Spending Clause After NFIB, 101 Geo. L.J. 861, 873 (2013) (rejecting the proposition that the plurality's analysis relied only upon the size of the grant at issue). Thus, we apply the plurality's approach to § 1396a(gg).

Under that analysis, Maine DHHS's Spending Clause challenge fails. Indeed, the plurality opinion precludes us from finding that there is a Spending Clause problem with § 1396a(gg). The MOE provision applied to the long-standing provision of care to 19- and 20-year-olds, unlike the new Medicaid program expansion first appearing in the ACA, is not a new program. It is simply an unexceptional "alter[ation] . . . [of] the boundaries" of the categories of individuals covered under the old Medicaid program, completely analogous to the many past alterations of the program that NFIB expressly found to be constitutional. See NFIB, 132 S. Ct. at 2606.

Section 1396a(gg) differs from the new program expansion considered in NFIB in several critical ways. As an initial matter, § 1396a(gg) does not "expand" Medicaid eligibility at all. It simply requires a state, as a condition of continued participation

-19-

in Medicaid, to maintain its Medicaid eligibility standards for "children" for nine years. See 42 U.S.C. § 1396a(gg)(2) (MOE provision applies to "the eligibility standards, methodologies, and procedures . . . that are applicable to determining the eligibility for medical assistance of any child who is under 19 years of age (or such higher age as the State may have elected)"). As NFIB noted, the Medicaid expansion "require[d] States to expand their Medicaid programs by 2014 to cover all individuals under the age of 65 with incomes below 133 percent of the federal poverty line" and "establishe[d] a new '[e]ssential health benefits' package." 132 S. Ct. at 2601 (citing 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(k)(1), 1396u-7(b)(5), 18022(b)).

What is more, § 1396a(gg) requires states to maintain eligibility standards for a population -- low-income children of certain ages -- that has historically been covered by Medicaid. Maine DHHS admits in its argument that the classic form of Medicaid provided coverage for the blind, the disabled, the elderly, and needy families with dependent children. In fact, the Medicaid program has an extensive history of covering 18- to 20-year-olds. At the time of Medicaid's enactment in 1965, the program included some 19- and 20- year-olds within the population of children that states had to cover. It did so first by requiring states to match the coverage of social assistance programs like Aid for Families with Dependent Children ("AFDC"), which defined eligible children

-20-

to include 19- and 20-year-olds in particular educational programs. See 42 U.S.C. § 606(a) (1964) (providing that AFDC was available to any "dependent child," defined as "a needy child (1) who has been deprived of parental support or care . . . and who is living with [one of several enumerated relatives] . . ., and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and . . . a student regularly attending [certain educational programs]"); Social Security Amendments of 1965, Pub. L. No. 89-97, sec. 121(a), § 1902(a)(10), 79 Stat. 286, 344-45 (codified at 42 U.S.C. § 1396a(a)(10) (1969)) ("A state plan for medical assistance must . . . provide for making medical assistance available to all individuals receiving aid or assistance under State plans approved under [AFDC] . . . .").

The Medicaid program also mandated that states provide medical assistance to all under-21 individuals who would have qualified as "children" for AFDC but for their age, thus removing the educational condition that limited the class of 19- and 20-year-olds covered under AFDC. See id. §§ 1902(b), 79 Stat. at 348 (codified at 42 U.S.C. § 1396a(b) (1969)); see also id. § 1904, 79 Stat. at 351 (codified at 42 U.S.C. § 1396d(a)(i) (1969)). Thus, from its early days, Medicaid contemplated mandatory coverage of some 19- and 20-year-olds, due to their status in federal law as "children" in need. Such a mandatory coverage requirement was in place when Maine joined Medicaid in 1966. The mandate to cover

children under 21 who would qualify for AFDC but for their age did not become optional until more than a decade later. See Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2172(b)(1), 95 Stat. 357, 808 (1981) (codified at 42 U.S.C. § 1396d(a)(i)); id. § 2172(a), 95 Stat. at 808 (codified at 42 U.S.C. § 1396a(b) (1983)).

There is an additional relevant point. The category of children for which a state must provide coverage has remained subject to expansion throughout the history of Medicaid. Alterations to the category of needy children occurred repeatedly in the 1980s, with states being required to cover an expanding group of children based on changing age and income requirements. Importantly, in 1990, Congress required states to cover all 18-year-olds who met certain income eligibility requirements, irrespective of their "dependent" status. Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4601(a)(2), 104 Stat. 1388, 1388-166 (1990) (codified at 42 U.S.C. § 1396d(n)(2)); id. § 4601(a)(1)(A), 104 Stat. at 1388-166 (codified at 42 U.S.C. § 1396a(a)(10)(A)(i)(VII)). In this way, children aged 18 -- historically treated by AFDC and Medicaid in the same manner as children under 21 -- thus became included in the mandatorily covered category without any condition other than their income level. That is so even though 18-year-olds are for many other purposes, including voting, treated as adults rather than children.

The history of Medicaid's treatment of 18-, 19-, and 20-year-olds further demonstrates that application of § 1396a(gg) here as to the treatment of 19- and 20-year-olds "accomplishes a shift in . . . degree," rather than in kind. NFIB, 132 S. Ct. at 2605; see also id. at 2606 (noting that a Medicaid "amendment requiring States to cover pregnant women and increasing the number of eligible children . . . . can hardly be described as a major change in a program that -- from its inception -- provided healthcare for 'families with dependent children'" (emphasis added)).[9]

Two further differences between the MOE provision and the new Medicaid program expansion considered in NFIB support the conclusion that the MOE provision did not accomplish a shift "in kind." First, the MOE provision uses the same pre-existing funding mechanism as pre-ACA Medicaid, whereas the expansion uses a new, more generous federal funding mechanism. Second, under § 1396a(gg), Maine is required only to maintain its current benefits for 19- and 20-year olds, whereas the Medicaid expansion required states to provide a "new '[e]ssential health benefits' package . . . to all new Medicaid recipients." NFIB, 132 S. Ct. at 2601 (first alteration in original). The NFIB Court explicitly mentioned both of these features of the expansion in its analysis.

_____

[9] The pregnancy program was not directly at issue in NFIB, but this language strongly suggests that the plurality viewed it as a permissible alteration of the old program.

It noted that "the manner in which the expansion [was] structured indicate[d] that . . . Congress . . . recognized it was enlisting the States in a new health care program" because "Congress created a separate funding provision to cover the costs of providing services to any person made newly eligible by the expansion" and because "Congress mandated that newly eligible persons receive a level of coverage that is less comprehensive than the traditional Medicaid benefit package."  Id. at 2606.

In short, the MOE provision as applied here does not create a new program and falls comfortably within Congress's express reservation of power to "alter" or "amend" the terms of the Medicaid statute in its coverage of previously covered groups. See Cong. Research Serv., Selected Issues Related to the Effect of NFIB v. Sebelius on the Medicaid Expansion Requirements in Section 2001 of the Affordable Care Act 5-6 (July 16, 2012), available at http://www.ncsl.org/documents/health/aca_medicaid_expansion_memo_1.pdf (concluding that the MOE provision of the ACA remains valid after NFIB because it is not "part of the 'new Medicaid expansion program' for which the states must have a 'genuine choice'"). Further, the states had notice at the inception of the Medicaid program that continued participation by a state in Medicaid might be conditioned on a requirement such as the MOE provision here.

As a result, there is no Spending Clause violation under NFIB.  See also California v. United States, 104 F.3d 1086, 1092

-24-

(9th Cir. 1997) (rejecting California's argument that Congress cannot introduce new conditions on participation in Medicaid because California "now has no choice but to remain in the program in order to prevent a collapse of its medical system"); <u>Stowell</u> v. <u>Ives</u>, 976 F.2d 65, 69 (1st Cir. 1992) (finding that statute providing that U.S. DHHS would not approve a state plan for medical assistance if the state reduced payment levels for the AFDC program provided "incentives -- not commands -- to the States," since states could choose to maintain AFDC benefits or to reduce them and risk losing federal funding). Rather, this is one of the "typical case[s]" in which "we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own." <u>NFIB</u>, 132 S. Ct. at 2603 (quoting <u>Massachusetts</u> v. <u>Mellon</u>, 262 U.S. 447, 482 (1923)).

Maine DHHS's arguments to the contrary are unconvincing. First, Maine DHHS argues that the MOE provisions are an "integral part" of the Medicaid expansion that was considered in <u>NFIB</u>, and so they must be struck down "as a direct implementation of the ruling in <u>NFIB</u>." Not so. The plurality focused exclusively on the amendments to Medicaid that required states "to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level." <u>NFIB</u>, 132 S. Ct. at 2606. The Court did not hold, or even intimate, that other changes to

Medicaid wrought by the ACA, such as the MOE provision at issue here, were constitutionally infirm. To the contrary, the plurality expressly stated that it was holding unconstitutional only the sanction of withholding all Medicaid funding from states that refused to accept this "basic change in the nature of Medicaid." Id. at 2608. "That remedy d[id] not require striking down other portions of the Affordable Care Act." Id.

Second, Maine DHHS contends that, regardless of its earlier choice to provide coverage for low-income 19- and 20-year-olds, Congress had not previously mandated this coverage, so the now-mandated MOE coverage is "new." It argues that "Congress cannot threaten to withdraw all Medicaid funds from a State for failing or refusing to cover categories of adults for whom Medicaid has never previously mandated coverage," regardless of the fact the state had chosen to provide such coverage. In fact, Congress can do so and it has done so, on numerous occasions. Moreover, the NFIB plurality expressly said Congress is allowed to do so, so long as the change effected by the expansion is a shift in degree rather than a shift in kind. See id. at 2605. NFIB approved of a past amendment that newly required states to cover pregnant women; that was a shift in degree and not in kind, as is this. Id. at 2605-06. Further, application here of § 1396a(gg) concerns children, a classic Medicaid program objective, not adults.

Third, Maine DHHS argues that § 1396a(gg) is "coercive" because "when a federal program is as large as Medicaid is . . ., the State has no option but to participate."  That is not the test NFIB has adopted.  Even were the question of tests open, Maine DHHS's Spending Clause claim based upon "coercion" alone does not work.  As the Supreme Court noted long ago, an attempt to determine when "inducement" to comply with a condition on the use of federal funds crosses the line into "compulsion" would "plunge the law into endless difficulties."  Davis, 301 U.S. at 590 (Cardozo, J.); see also Oklahoma v. Schweiker, 655 F.2d 401, 413-14 (D.C. Cir. 1981) ("The courts are not suited to evaluating whether the states are faced . . . with an offer they cannot refuse or merely a hard choice.").

Maine DHHS's argument that the MOE provision is indistinguishable from the Medicaid expansion considered in NFIB is, as explained, unpersuasive.  As it affects Maine, the MOE provision requires Maine to do no more than continue to cover low-income individuals aged 18 to 20 for a period of nine years, and in exchange Maine will receive the classic funding.  By contrast, the new Medicaid program expansion would have required Maine to cover all low-income individuals indefinitely.  NFIB, 132

S. Ct. at 2606. Those changes are not the same nor even analogous.[10]

C.          Claimed Pennhurst Anti-Retroactivity Violation

Maine DHHS also argues that the application to it of the MOE provision violates the Pennhurst anti-retroactivity principle because Congress "changed the deal" it offered to Maine in 2009. Maine DHHS points out that, in 2009, Maine was required to maintain eligibility standards only through 2010 in order to get the stimulus funds it had chosen to seek. Then, in 2010, with the passage of the ACA, Maine was required to maintain those standards through 2019 in order to avoid losing all Medicaid funds.

This retroactivity argument fails. In Pennhurst, the Supreme Court explained that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." 451 U.S. at 17. But a state cannot "voluntarily and knowingly accept[] the terms of the 'contract'" if it "is unaware of the conditions or is unable to ascertain what is expected of it." Id. Thus, "if Congress intends to impose a condition on the

---

[10]     In briefing and at oral argument, counsel for Maine DHHS argued that, because "the NFIB Court did not sever the application of the Medicaid expansion only to those 21 and above," the decision means that Congress may not make coverage of 19- and 20-year-olds mandatory. We see no basis to so conclude. The question of whether to sever application of the expansion to 18- to 20-year-olds from application of the expansion to 21- to 64-year-olds was not before the Court in NFIB.

grant of federal moneys, it must do so unambiguously"; it may not "surpris[e] participating States with post acceptance or 'retroactive' conditions." Id. at 17, 25.

The ACA did not "surprise" Maine with a retroactive condition. Because Congress has reserved in the Medicaid Act the power to "alter" or "amend" the Medicaid program, states have had fair notice that Congress may make incremental changes such as "increasing the number of eligible children." NFIB, 132 S. Ct. at 2606.[11] Here, Congress did not even go that far; instead, it merely required that states continue providing coverage to children on the same terms as were in effect on the date of the ACA's passage. Maine DHHS appears to argue that it could not have foreseen that in exchange for stimulus funds it would be locked into those coverage levels at a later time. But this modest change falls within the Medicaid Act's broad reservation clause. Maine was on notice, both before and after accepting stimulus funds, that an incremental alteration of Medicaid might change the conditions on participation in the Medicaid program in the way that § 1396a(gg) has. Put differently, Maine was not "unaware of the conditions [on its participation in Medicaid] or . . . unable to ascertain what [was] expected of it," Pennhurst, 451 U.S. at 17, when it chose to

---

[11]    As explained in greater detail above, at the inception of the Medicaid program, states were required to cover individuals aged 18 to 20 if they would have qualified for the AFDC program but for their age, and Congress at one point expanded Medicaid to cover 18-year-olds regardless of their status as "dependents."

receive funds under Medicaid or under the ARRA. There is no constitutional infirmity here.

### III. Equal Sovereignty Claim

Maine DHHS also argues that the MOE provision deprives Maine of its right to equal sovereignty under Shelby County v. Holder, 133 S. Ct. 2612 (2013), because it "prohibit[s] Maine from exercising the prerogative to design its Medicaid laws in ways that many of its sister States remain free to do." This argument fails at every step of the analysis. First, Maine DHHS's premise that § 1396a(gg) singles out certain states for disparate treatment is wrong. Shelby County is also not relevant here because § 1396a(gg) does not similarly effect a federal intrusion into a sensitive area of state or local policymaking. Finally, there is no constitutional problem because any disparate treatment caused by § 1396a(gg) is sufficiently related to the problem that the statute was designed to address.

A.  Shelby County

Shelby County considered the continuing constitutionality of §§ 4 and 5 of the Voting Rights Act (VRA) of 1965. Section 4 set forth a "coverage formula" that identified jurisdictions with a history of voter discrimination, and § 5 required those jurisdictions to obtain "preclearance" for any change in voting procedures by "proving that the change had neither 'the purpose [nor] the effect of denying or abridging the right to vote on

-30-

account of race or color.'"  Id. at 2618-20 (alteration in original).  In the years after the VRA's passage, Congress repeatedly re-authorized the Act (most recently in 2006), but it made no changes to § 4's coverage formula after 1975.  Id. at 2620-21.

The Shelby County Court held that § 4's coverage formula unconstitutionally infringed the equal sovereignty of the states. Id. at 2623-31.  The majority explained that, when a statute "authorizes federal intrusion into sensitive areas of state and local policymaking, . . . and represents an extraordinary departure from the traditional course of relations between the States and the Federal Government," id. at 2624 (citations omitted) (internal quotation marks omitted), "any 'disparate geographic coverage' must be 'sufficiently related to the problem that it targets.'"  Id. at 2627 (quoting Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 203 (2009)).[12]  The Court found that § 4's coverage

---

[12]    Shelby County relied primarily on two cases for its discussion of the equal sovereignty doctrine: Coyle v. Smith, 221 U.S. 559 (1911), and Northwest Austin.  Coyle held that

> when a new state is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original states, and that such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission.

formula as used in <u>Shelby County</u> did not satisfy this test because it was "based on decades-old data and eradicated practices." <u>Id.</u> at 2627.

B.        <u>Disparate Treatment</u>

Maine DHHS's premise that § 1396a(gg) results in "disparate treatment" of states, as that phrase was used in <u>Shelby County</u>, is mistaken. On its face, the MOE provision applies the same rule to each state: freeze eligibility standards in existence as of March 23, 2010 until October 1, 2019, or risk losing Medicaid funding. In <u>Shelby County</u>, the government admitted that the coverage formula was "'reverse-engineered': Congress identified the jurisdictions to be covered and <u>then</u> came up with criteria to describe them." <u>Id.</u> at 2628. In contrast, Maine has not been "singled out" at all. The rule is uniform and performs an important function of not providing incentives to states to act in ways Congress wishes to avoid. <u>See, e.g.</u>, <u>Bennett</u> v. <u>Ky. Dep't of Educ.</u>, 470 U.S. 656, 671–72 (1985). Every state has simply been

---

221 U.S. at 573. In other words, Congress can enact laws affecting a state differently from other states at the time of its admission only if Congress could constitutionally do so after the state's admission. <u>Northwest Austin</u> expressed concerns in dicta that the VRA might conflict with "our historic tradition that all the States enjoy 'equal sovereignty.'" 557 U.S. at 203 (quoting <u>United States</u> v. <u>Louisiana</u>, 363 U.S. 1, 16 (1960)).

required to continue for a limited period of time[13] to fund Medicaid services for those children it was funding before the ACA.

Maine DHHS resists this distinction, pointing out that even the preclearance requirement in Shelby County, in a sense, applied to all states. This contention is unpersuasive. In Shelby County, the government expressly admitted that it had singled out certain states for disfavored treatment and then reverse-engineered a coverage formula that would target only those states. 133 S. Ct. at 2628. Here, in contrast, there is no suggestion that the MOE provision was "reverse-engineered"; from all indications, Congress came up with the criteria without regard to which states would be covered by their application.

C.      Intrusion Into a Sensitive Area of State or Local Policymaking

We reject Maine DHHS's equal sovereignty claim for another reason as well. Shelby County involved a situation of federal "intrusion[s] into sensitive areas of state and local policymaking," id. at 2624, and required in that context that disparate treatment must be "sufficiently related to the problem that it targets," id. at 2627. The Court repeatedly emphasized that the VRA marked an "extraordinary" departure from basic principles of federalism because it intruded into a realm (regulation of state and local elections) that has traditionally

---

[13]     Section 1396a(gg) will remain in effect only until 2019. See 42 U.S.C. § 1396a(gg)(2).

been the exclusive province of the states.[14]  Id. at 2618 (characterizing § 5 as a "drastic departure from basic principles of federalism"); id. at 2623 (noting that the Framers "intended the States to keep for themselves . . . the power to regulate elections"); id. at 2624 (stating that the VRA "'authorizes federal intrusion into sensitive areas of state and local policymaking,' . . . and represents an 'extraordinary departure from the traditional course of relations between the States and the Federal Government'"); id. at 2630 (explaining, "[a]t the risk of repetition," that the VRA is "far from ordinary"); id. at 2631 (stating that any preclearance formula must reflect conditions that "justify[] such an 'extraordinary departure from the traditional course of relations between the States and the Federal Government'").  The equal sovereignty doctrine has been applied only in such extraordinary situations.  See NCAA v. Governor of N.J., 730 F.3d 208, 239 (3d Cir. 2013) ("[T]here is nothing in Shelby County to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'" (quoting Shelby

---

[14]     Similarly, in Coyle v. Smith, the challenged federal statute mandated that Oklahoma, as a condition of admittance to the Union, establish its state capital in a particular city.  See 221 U.S. 559, 564 (1911).  The Court found that this statute violated the equal sovereignty doctrine, noting that "[t]he power to locate its own seat of government, and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers."  Id. at 565.

County, 133 S. Ct. at 2624)).[15]  This is not such an extraordinary situation.  Federal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system.  Indeed, MOE provisions like the one at issue here have long been a common feature of federal spending programs, including Medicaid.  See, e.g., Social Security Amendments of 1965, Pub. L. No. 89-97, sec. 121(a), § 1902(c), 79 Stat. 286, 348 (codified at 42 U.S.C. § 1396a(c) (1969)) (MOE provision in the original Medicaid statute); Bennett, 470 U.S. at 671 (describing MOE provision in the Elementary and Secondary Education Act of 1965).

The MOE provision at issue here does not intrude on an area of traditional state concern; to the contrary, it simply requires an extension of states' prior choices to participate in a limited federal-state cooperative program.  Maine DHHS's assertion that the MOE provision affects its "ability to pass and implement laws, in the exercise of the fundamental police power over health and welfare" is stated at much too high a level of generality to be

_____

[15]   In NCAA, the Third Circuit rejected an equal sovereignty challenge to a statute that, in effect, prohibits casino-operated sports books outside of Nevada.  The Third Circuit held that the Commerce Clause, under which the challenged statute had been enacted, "'does not require geographic uniformity.'"  Id. at 238 (quoting Morgan v. Virginia, 328 U.S. 373, 388 (1946) (Frankfurter, J., concurring)).
We need not and do not hold that the equal sovereignty doctrine is categorically inapplicable to congressional action under the Spending Clause.  We simply find the doctrine inapplicable on the facts of this case.

true.  A state's ability to set the conditions of eligibility for participation in a federal health insurance program that is funded primarily by the federal government is not a core sovereign state function in the same way as is a state's ability to regulate the conduct of its elections.  Cf. NCAA, 730 F.3d at 237–39 (reasoning that the equal sovereignty doctrine did not apply to a statute affecting a state's ability to pass laws legalizing sports gambling).

Put simply, the MOE provision is not at all an "intrusion," much less an intrusion into state sovereignty as was true of § 4 of the VRA.  The equal sovereignty doctrine of Shelby County is not applicable to this case.

D.      Sufficient Justification

Maine DHHS makes, and we reject, an argument that under Shelby County the MOE provision is not sufficiently related to the problem it targets.  Shelby County permits legislation that "single[s] out" states if the singling out "makes sense in light of current conditions."  133 S. Ct. at 2629.  The coverage formula of § 4 of the VRA failed that test because it was "based on decades-old data and eradicated practices."  Id.  at 2627.  Section 1396a(gg), in contrast, does "make[] sense in light of current conditions," and so, to the extent that it results in disparate treatment of states at all, the disparity is permissible.

Congress has long used temporary MOE provisions in Medicaid and other benefits programs for a specific, legitimate purpose: to protect low-income individuals from losing public assistance in times of transition between different statutory schemes for delivering that assistance.[16] The MOE provision at issue here is no different. As counsel for the United States explained at oral argument, when Congress passed the ACA, it did not want to create incentives for states to drop children previously covered "on the often mistaken premise that they will be easily transitioned to new coverage," when "in fact, there are gaps in enrollment, people lose better benefits packages, or Congress may just not want to shift from an existing program to one that is now funded through [new] federal dollars." And as amici point out, Congress was entitled to consider that widespread withdrawal of coverage for children could have a serious impact on the public fisc, since children who have health insurance are more likely to avoid serious (and expensive) long-term health problems that often beset children who lack insurance. The MOE provision avoided these potential negative consequences of the shift from the pre-ACA

---

[16] For example, when Congress passed the Medicaid statute in 1965, it included a provision prohibiting the U.S. DHHS from approving a state plan that would result in a reduction in aid or assistance provided under any of the five assistance programs related to Medicaid eligibility, such as AFDC. See Social Security Amendments of 1965, Pub. L. No. 89-97, sec. 121(a), § 1902(c), 79 Stat. 286, 348 (codified at 42 U.S.C. § 1396a(c) (1969)).

regime.    The coverage conditions here are based on "current conditions" and address real problems.

Thus, we reject Maine DHHS's argument that "the MOE provisions . . . [are] not sufficiently tailored to any constitutional purpose."[17]  To the contrary, § 1396a(gg) directly serves the legitimate purpose of ensuring that children do not lose health insurance as the country transitions from the pre-ACA Medicaid regime to the post-ACA Medicaid regime.  This is a far cry from the situation the Court confronted in Shelby County, where Congress "reenacted a formula based on 40-year-old facts having no logical relation to the present day."  133 S. Ct. at 2629.  Any disparity in treatment caused by the MOE provision is justified.

## IV.  Conclusion

We deny the petition for review and find no constitutional violation.  Costs are awarded against Maine DHHS.

---

[17]    Maine DHHS contends that, because "the MOE provisions . . . form an integral part . . . of the Medicaid Expansion," "[i]t is clear that the purpose of the MOE provisions is promotion of a constitutional wrong: the mandatory Medicaid Expansion under ACA § 2001."  But Maine DHHS's premise that the MOE provisions were an "integral" part of the new Medicaid program expansion considered in NFIB is pure speculation; as Maine DHHS admits, Congress did not, and was not required to, make explicit findings as to the rationale behind the MOE provision.  Moreover, even if Maine DHHS's speculation were correct, it remains true that the independent justification for the MOE provision offered by the United States -- preserving public assistance benefits for children in a time of transition between different public assistance programs -- is entirely valid.